JOSEPH S. LEVENTHAL (221043)
joseph.leventhal@dinsmore.com
DINSMORE & SHOHL LLP
655 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-0500
Fax: (619) 400-0501

Attorneys for Plaintiff
TCR HOLDINGS, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCR HOLDINGS, LLC<br><br>Plaintiff,<br><br>v.<br><br>AXXCESS CAPITAL PARTNERS, LLC<br><br>Defendant. | CASE NO. '21CV1027 L    RBB<br><br>**TCR HOLDINGS, LLC'S COMPLAINT FOR BREACH OF CONTRACT**<br><br>**DEMAND FOR TRIAL BY JURY** |

1

## I.  JURISDICTION

1.      Plaintiff TCR Holdings, LLC ("Plaintiff") is a Delaware limited liability company.

2.      Defendant Axxess Capital Partners, LLC ("Defendant" or "Axxess Capital") is a Delaware limited liability company, engaged in the business of investment capital, and is currently FTB suspended by the California Secretary of State.

3.      Jurisdiction is vested in this Court under 28 U.S.C. Section 1332 because the Parties are citizens of different states and the amount in controversy, excluding interest and costs, exceeds $75,000.  Plaintiff has seven members, which are citizens of New York, Tennessee, Texas, Utah and Delaware.  Upon information and belief, all members of Defendant are diverse from Plaintiff.

4.      Venue is proper in this Court under 28 U.S.C section 1391 because Defendant is located in this district.

## II. FACTUAL BACKGROUND

5.      In September 202, Plaintiff loaned $9,500,000 to AIM Brands, LLC ("AIM Brands"), via execution of a promissory note.

6.      AIM Brands received another $500,000 loan from Fletcher Analytics, LLC.

7.      Using the above loan proceeds, AIM Brands purchased 15 million total units of Kimberly Clark Kimtech 53358 N95 Respirators (the "Units").

8.      AIM Brands then entered into an irrevocable corporate purchase order – TRG-AIM-YCDB-AXXCESSv1 (the "ICPO") dated November 21, 2020 with the Ravenswood Group, LLC, a Florida limited liability company ("Ravenswood Group").  The ICPO obligated the Ravenswood Group to purchase the units at $2.05 per mask, for a total purchase price of $30,750,000.  The ICPO is attached hereto as **Exhibit A**.

///

9.     Ravenswood Group subsequently agreed to transfer its obligations under the ICPO on November 21, 2020 to Defendant Axxcess Capital for $1.00.  The transfer confirmation, signed by Defendant's Managing Director, Rob Gabaldon, is attached hereto as **Exhibit B.**

10.     Per the terms of **Exhibit B,** Defendant Axxcess became obligated to purchase the Units for $30,750,000.

11.     AIM Brands promptly invoiced Defendant on November 22, 2020 for the Units as requested by Defendant, invoice A-1122-20 attached hereto as **Exhibit C,** and simultaneously scheduled an inspection of 11,016,000 Units located in a warehouse in Rogers, Arkansas (the "Arkansas Units").

12.     Defendant's representative, Tiago Lewis, performed said inspection in Rogers, Arkansas, on November 23, 2020, and approved the Arkansas Units.  The remaining 3, 996,000 Units are being held by Kimberly Clark (the "KC Units").

13.     Thereafter from November 24, 2020 through November 30, 2020, AIM Brands repeatedly contacted Defendant's Managing Director, Ron Gabaldon, as well as other representatives of Defendant, to obtain Defendant's performance in the form of payment under the ICPO.  Those representatives repeatedly confirmed agreement, stating (as shown in **Exhibit D**, a multi-page compilation of communications), for example:

- "the funds will be sent once the attorney get into the office today";
- We are closing that today";, and
- Thanksgiving caused payment to "delay a few days.  However we will close this deal".

14.     Defendant's representatives repeatedly assured AIM that the transaction would be funded and completed within days.

15.     When no payment was received, AIM then contacted Defendant's principals on December 10, 2020 requesting the status of payment.

///

16.     AIM also subsequently filed a complaint with the Financial Industry Regulatory Authority ("FINRA") on December 10, 2020, under complaint file #20200689856 regarding Defendant's nonpayment.

17.     AIM and Plaintiff have continued to demand payment from Defendant, with Defendant continuing to promise during April and May 2021 that certain substantial payments would be made.

18.     But to date, no payment from Defendant has been received.

19.     On May 18, 2021, AIM Brands entered into an assignment agreement with Plaintiff (attached hereto as **Exhibit E**), whereby AIM Brands assigned to Plaintiff all of its rights to receive and pursue payment from Axxcess Capital under the ICPO (as well as related pertinent rights to the Units.)

## FIRST CAUSE OF ACTION

(Breach of Contract for Nonpayment)

20.     Plaintiff restates the allegation in paragraphs 1 through 19 as if fully restated herein.

21.     The ICPO (as assigned to Defendant as shown on **Exhibits A and B,** and confirmed with the invoice on **Exhibit C)**, is a valid and enforceable agreement, with payment obligations owed by Defendant.

22.     Defendant is obligated to pay for the sale of 15 million Units, with a total owed of $30,750,000.

23.     The Arkansas Units were inspected and approved by Defendant's representative Tiago Lewis, and thus, Plaintiff has provided the goods as required.

24.     Plaintiff, therefore, has performed all obligations required of it.

25.     Defendant and its representatives even confirmed the intent to pay.

26.     But, Defendant has not paid the amount owed, and the failure to pay constitutes a material breach of its obligations (as shown on **Exhibits A, B, C** and **D**.)

///

27.     Defendant owes to Plaintiff a balance in the amount of $30,750.00, plus interest, attorney fees, and the costs of this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

(a) Judgment against Defendant in the amount of $30,750,000 plus costs incurred in the action, reasonable attorney fees, pre and post-judgment interest at the statutory rate;

(b) All other relief, monetary or equitable, which this Court deems just and appropriate.

Dated: May 28, 2021                    Respectfully submitted,

DINSMORE & SHOHL LLP

By: /s/ Joseph S. Leventhal
JOSEPH S. LEVENTHAL
Attorneys for Plaintiff,
TCR Holdings, LLC

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), TCR Holdings, LLC demands a trial by jury for all claims so triable.

Dated: May 28, 2021                    Respectfully submitted,

DINSMORE & SHOHL LLP

By: /s/ Joseph S. Leventhal
JOSEPH S. LEVENTHAL
Attorneys for Plaintiff,
TCR Holdings, LLC

# EXHIBIT A

Exhibit A



## ICPO

| Date: 11/21/2020 | | Seller Invoice No : TBD | |
|---|---|---|---|
| **Seller Code:** | | **Buyer Code:** | TRG-AIM-YCDB-AXXCESS v1 |
| Company | Aim Brands | Company | The Ravenswood Group (xfer to AXXCESS) |
| Address | 1000 Westpark Drive, Suite 18, Bentonville, AR 72712 | Address | 7950 NW 53rd Street, Suite 337 Miami, Florida 33166 |
| Attention | Marcus Gibbs, VP Sales | Attention | Gregory Gustin, CEO/President |
| Email | Marcusgibbs@aimbrands.net | Email | Greg.Gustin@TheRavenswoodGroup.com |
| Phone | 8 3 3 - 7 2 6 - 7 7 5 9 | Phone | +1.888.265.6962 / +1.863.2453.9599 (c) |
| **Seller Bank Info** | | **Buyer Bank Info** | |
| Name | | Name | Will be provided by AXXCESS Capital |
| Address | | Address | |
| Account Name | | Account Name | |
| Account | | Account | |
| SWIFT | | SWIFT | |

| PROCEDURES | | PRODUCT DESCRIPTION: | |
|---|---|---|---|
| **Delivery:** | FOB Sellers Warehouse | Item | KimTech by KC 53358 N95 Mask |
| **Loading Port:** | M/A | SKU | |
| **Consignee:** | N/A | UPC | |
| **Destination:** | N/A | NSN | |
| **Delivery Time:** | Site visit set for 0900 Rogers Arkansas | Quantity | 15 million total units (Masks) |
| **Payment:** | Wire Transfer against physical onsite approval documents showing Quality and Quantity as approved by AXXCESS | ALL AMOUNT IN US DOLLARS | |
| **Packing:** | TBP by AIM Brands | UNIT PRICE | QUANTITY |
| | **Sold under Incoterms 2020** | $2.05 per mask | **15,000,000 Fifteen Million Masks** |
| **Reference Information:** | | | |
| **Bill of Lading #:** to be provided at time of loading | | **$30,750,000.00 USD** | |
| **Container ID #:** to be provided at time of loading | | Estimate TOTAL: (ADJUSTED FOR ACTUAL AMOUNT) | |
| **Note:** 1. TRG will assign(transfer) its rights for the purchase of this allotment to AXXCESS Capital. Per the CC today (11/21) Aim Brands will co-sign this PO, then | | | |
| 2. TRG will also then transfer its Sell Agreement to AXXCESS over to AIM. | | | |
| **3.** All pricing and fee Agreements will remain as previously agreed. | | | |
| **4.** TRG makes all these transfers for $1. - just to be binding :P | | | |

**Buyer: Gregory Gustin**

**Seller:**

# **<u>EXHIBIT B</u>**

Exhibit B



**PURCHASE ORDER**

**AXXCESS**
C A P I T A L

**Axxcess Capital Partners, LLC**
**Ron Gabaldon | Eugene Young**
**2100 Palomar Airport Rd. Suite 214**
**Carlsbad, CA 92011**

To: The Ravenswood Group

SHIP TO:
**Axxcess Capital to Pick Up in AR**

P.O. NUMBER: **20-00443**

P.O. number must appear on
all related correspondence,
shipping papers, and invoices

Transferred to New Brands per Agreement

| P.O DATE | REQUISITIONER | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| 11/21/2020 | Ron Gabaldon | Eugene Young | | Arkansas | Wire Transfer prior to pick-up |

| QTY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 15 Million | | Kimberly Clark Model 53358 N95 | $2.05 | $30,750,000.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | |
|---|---|---|
| SUBTOTAL | | $30,750,000.00 |
| SALES TAX | | N/A |
| SHIPPING AND HANDLING | | N/A |
| OTHER | | |
| TOTAL | | $30,750,000.00 |

1. Please send two copies of your invoice.
2. Enter this order in accordance with the prices, terms, delivery method, and specifications listed above.
3. Please notify us immediately if you are unable to ship as specified.
4. Send all correspondence to:
   Eugene Young
   Email : info@secureamericasales.com
   Phone : 470.378-6520

Authorization: Ron Gabaldon | Eugene Young   11/21/2020

Exhibit B-1

---------- Forwarded message ---------
From: **Ron Gabaldon** <rgabaldon@axxcesscapital.com>
Date: Sun, Nov 22, 2020 at 12:52 PM
Subject: Axxcess PO
To: Greg Gustin (CEO/President TRG <Greg.Gustin@theravenswoodgroup.com>
Cc: eugene young <info@secureamericasales.com>

Greg,

Per our discussion, you will present our purchase order, direct to the seller.  Eugene Young will represent Axxcess Capital on the call, today.

Let me know if you need anything additional, from me.

Regards,

Ron



Axxcess Capital Partners, LLC
Ron Gabaldon – Managing Director

# **EXHIBIT C**

Exhibit C

AIM BRANDS, LLC
1000 SW Westpark Dr
Suite 18
Bentonville, AR 72712



**INVOICE**
November 22, 2020

**BUYER:**
**AXXCESS CAPITAL PARTNERS, LLC**
2100 PALOMAR AIRPORT ROAD, SUITE 214
CARLSBAD, CA 92011
ATTN: RON GABALDON / EUGENE YOUNG
(470) 378-6520 / INFO@SECUREAMERICASALES.COM

**BUYER PURCHASE ORDER#:  20-00443**

| SHIP FROM: | SHIP TO: | INVOICE NUMBER: |
|---|---|---|
| AIM BRANDS c/o | *FOB Rogers, AR* | **A-1122-20** |
| NWA Logistics / ESCO Processing | *(Buyer Covers Shipping)* | |
| 2111 S 8th St | *additional quantities can ship from factory* | |
| Rogers, AR 72758 | | |

This invoice corresponds with the fully executed Irrevocable Corporate Purchase Order (ICPO) # TRG-AIM-YCDB-001 from the Ravenswood Group of Miami, FL and transferred to the Buyer, Axxcess Capital.  The Buyer's executed Purchase Order #20-00443 was also signed and accepted by AIM Brands, LLC on 11-22-2020.  This purchase invoice is binding.  Payment in full is due upon acceptance of goods with site inspection scheduled on Monday, November 23, 2020.  Certificate of Analysis (COA) reports will be available during the inspection and may be verified by Lot # with Kimberly Clark.

| INVOICE DATE | INVOICE NUMBER | SHIPPED VIA | SHIP POINT | PAYMENT TERMS |
|---|---|---|---|---|
| 11/22/2020 | M-1114-11 | FOB | Rogers, AR | 100% Upon Inspection of Goods |

| QTY | UNIT | DESCRIPTION | | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| 15,000,000 | Each | 50,000 Cases (300 units per case) N95 – 53358 | | $2.05 | 30,750,000 |
| | | | | | |
| **Binding Terms of Sale** | | | | | 0 |
| FOB Rogers, AR  (Buyer Pays for Freight) | | | SHIPPING AND HANDLING | | 0 |
| AIM to Provide COA of All Lots Upon Inspection | | | | | |
| Payment to be made after site inspection and document approval | | | | | |
| | | | OTHER | | 0 |
| Aim Invoice and Buyer PO Constitute Binding Contract | | | | | |
| Any additional quantities may be filled from the factory. | | | | | |
| ***Offer valid until 11/24/2020** | | | DUE ON ACCEPTANCE OF GOODS | | 30,750,000 |

Authorized Seller: _____

Kit Nowlin
AIM Brands, LLC

Authorized Buyer: _____

Eugene Young
Axxcess Capital Partners,LLC

# **EXHIBIT D**







 12:27 65%

Eugene Young
+14703786520

E: We're verifying the lot numbers on the KC website now. 13:14

Ok. Nice. Takes how long? Never used KC sites... Just curious... Here to help if you need me... 13:54

E: Not sure. It's quite a few lot numbers. 15:27

Tuesday, November 24, 2020

Good morning. Please confirm inspection passed the test and funds will be wired this morning. This was asked of me by the seller. And. Ready to talk about my masks as soon as you can. they are burning s whole in my warehouse 😯 08:17

Good morning, can you give me a quick call. I'm getting ping from both sides.ty 09:33

E: Good morning

12:28 65%

Eugene Young
+14703786520

Good morning. Please confirm payment was already sent. If not, why not? At least send Copy of account statement that had the funds 09:21

Or letter from lawyer stating funds in escrow...ty 09:22

E: Morning. The funds will be sent once the attorney get into the office today. We do not have a exact time that will happen. Thanksgiving week delayed the delay a few days. However, we will close this deal. 09:33

Thanks for update. Lazy lawyer 🤣 09:34

E: Turkey 🦃 Lawyer!!! Lol 09:36

I hear that...😜 09:37

New 12:16

12:28 65%

Eugene Young
+14703786520

Good morning. Please confirm payment was already sent. If not, why not? At least send Copy of account statement that had the funds 09:21

Or letter from lawyer stating funds in escrow...ty 09:22

E: Morning. The funds will be sent once the attorney get into the office today. We do not have a exact time that will happen. Thanksgiving week delayed the delay a few days. However, we will close this deal. 09:33

Thanks for update. Lazy lawyer 🤣 09:34

E: Turkey 🦃 Lawyer!!! Lol 09:36

I hear that...😜 09:37

New 12:16

12:28 65%

Eugene Young
+14703786520

K ty 11:36

Hey: not trying to bug you , but been three hours and nothing definitive. and this is not the fair to the seller. So please provide at least a written affirmation that the test has been passed and the funds have been or will be wired with a deadline. Something must be wrong or this would have happen 12:13

View all

FYI. 12:54

I just had a nice chat with Ron who confirmed the goods were verified and money was on its way to escrow. I reminded him that the goods were not to be escrowed. He agreed. 13:07

Did you see the cc requested by seller for 12 today?

12:28 65%

Eugene Young
+14703786520

May I ask why the lawyers working on payment Arkansas as opposed to just telling the bank to do it.. are some other issues for the transfer of funds from place to place? please let me or the seller know so he does not have continued empty expectations...ty 10:44

E: Yes, no problem. I stated on the call yesterday The funds had to be transferred from a different account to our attorney escrow account for each specific transaction. 10:49

I am inferring using your exit buyer funds into escrow. Then paying to seller. Is ok. Just need to be open on time line... please prove funds are enroute to escrow. Should have been on the way since yesterday. And I humbly suggest letting seller know real time line and make at least a 10% deposit. Y

12:31 64%

Ron gabaldon
6302478557

Please keep Arkansas happy... They already extended payment expectations 2x..ty 09:33

R: We are closing that today. We need the product. 09:33

**Kit Nowlin** <kitnowlin@aimbrands.com>                                    Tue, Nov 24, 2020, 3:50 PM   ☆   ↰   ⋮
to eugene, Greg, Ron, Marcus ▾

Team,

    Thanks for the call today.  Per the conversation, we would request that you provide an email today from your attorney that funds are in escrow and ready to be transferred to AIM.  We will ensure that there is transfer of title immediately and cc the warehouse manager of NWA Logistics, where you can place your rider policy with them.  Also, if you would like to arrange any sort of 3rd party security, I know that Greg has some former special ops team members who provide this service. We will help with scheduling and logistics as you require/request.

    I just want to do everything we can today to ensure that tomorrow is about funding and transfer and not about additional requests or paperwork.

Kit Nowlin
AIM Brands
Managing Director
214-529-1718

•••

**eugene young** <info@secureamericasales.com>                                    Fri, Nov 27, 2020, 11:46 AM   ☆   ↰   ⋮
to me, Greg, Ron, Marcus ▾

Good Afternoon,

Team, I'm on a zoom call and boarding a plane as I type this email. So, I apologize for not being able to call you guys directly. However, I had an opportunity to speak with the attorney and the delay on the deal is the holiday week and everyone is on vacation. The person that's actually sending these funds will be back in the office on Monday. They have been advised to send those funds immediately upon getting back from vacation. This will delay the deal in Arkansas until Monday. We look forward to closing this transaction and moving on to the next one. Thanks

Best Regards,
Eugene Young

Sent from my iPhone

    On Nov 26, 2020, at 9:57 PM, Kit Nowlin <kitnowlin@aimbrands.com> wrote:

    •••



**Kit Nowlin** <kitnowlin@aimbrands.com>
to eugene, Greg, Ron, Marcus

Mon, Nov 30, 2020, 8:28 AM

Eugene,
    Per your email, we should be looking to complete the transaction this morning. Please advise timing and details and we will immediately begin preparations for logistics.

Kit Nowlin
114-529-1718

Sent from my iPhone

> On Nov 27, 2020, at 11:46 AM, eugene young <info@secureamericasales.com> wrote:
>
> Good Afternoon,
> …

**Kit Nowlin** <kitnowlin@aimbrands.com>
to Ron, eugene, Greg, Marcus

Mon, Nov 30, 2020, 5:39 PM

Ron,
    I need a direct update from you on this transaction.  Please contact me today.
Kit Nowlin
AIM Brands, LLC
214-529-1718

Sent from my iPhone

> On Nov 24, 2020, at 11:57 AM, Kit Nowlin <kitnowlin@aimbrands.com> wrote:
>
> Hi Ron,
> …

**Ron Gabaldon**
I am available for a call, this evening. I am wrapping up a team meeting and can talk in 30 minutes. Will that work? Ron

Nov 30, 2020, 6:12 PM

# **EXHIBIT E**

## ASSIGNMENT AGREEMENT

This Assignment Agreement ("Agreement"), effective as of May 18, 2021, is made by and between AIM BRANDS, LLC, a Delaware limited liability company ("Assignor" or "AIM Brands") and TCR HOLDINGS, LLC, a Delaware limited liability company ("Assignee" or "TCR Holdings"). Fletcher Analytics, LLC ("Fletcher") is a signatory due to its loan to AIM Brands. AIM Brands, TCR Holdings, and Fletcher are sometimes referred to in this Agreement individually as a "Party" and collectively as the "Parties."

WHEREAS TCR Holdings loaned $9.5 million to AIM Brands in September 2020, with TCR Holdings and AIM Brands executing a promissory note (attached hereto as Exhibit A) reflecting the terms of the loan;

WHEREAS Fletcher Analytics loaned $500,000 to AIM Brands in September 2020, with Fletcher Analytics and AIM Brands executing a promissory note (attached hereto as Exhibit B) reflecting the terms of the loan;

WHEREAS AIM Brands received the loan proceeds detailed above from each of TCR Holdings and Fletcher Analytics and used those proceeds to purchase 15 million total units of Kimberly Clark Kimtech 53358 N95 Respirators (the "Units"), which units serve as collateral under the above-referenced notes;

WHEREAS AIM Brands entered into an irrevocable corporate purchase order TRG-AIM-YCDB-AXXCESSv1 dated on or around November 21, 2020 ("ICPO") with The Ravenswood Group, LLC, a Florida limited liability company ("Ravenswood"), for the sale by AIM Brands to Ravenswood of the 15 million Units, at $2.05 per mask – for a total owed by Ravenswood to AIM Brands of $30.75 million, a copy of which is attached hereto at Exhibit C;

WHEREAS AIM Brands understands that Ravenswood transferred to Axxcess Capital, LLC ("Axxcess Capital") the obligations under the ICPO on November 21, 2020, as evidenced by the documents attached hereto at Exhibit C;

WHEREAS AIM Brands provided an invoice directly to Axxcess Capital (invoice A-1122-20), as requested by Axxcess, on November 22, 2020, and simultaneously scheduled an inspection of the 11,016,000 Units it holds in the warehouse in Rogers, Arkansas (the "Arkansas Units"), which inspection was completed by Tiago Lewis for Axxcess Capital on November 23, 2020. The remaining 3,996,000 Units are being held for AIM Brands by Kimberly Clark (the "KC Units");

WHEREAS a representative of AIM Brands, filed a complaint with FINRA on December 10, 2020 (complaint file #20200689856) regarding Axxcess Capital's non-performance (non-payment);

WHEREAS Axxcess Capital has not made payment as required by the ICPO;

WHEREAS AIM Brands has not made quarterly interest payments to TCR Holdings or Fletcher Analytics as required under the above-referenced notes;

WHEREAS AIM Brands does not wish to incur the burden or expense of litigation against Axxcess Capital, but is willing to assign to TCR all of AIM Brands' rights against Axxcess Capital or otherwise involving the ICPO; and

WHEREAS, Fletcher Analytics also wishes to approve of the assignment to TCR of all of AIM Brands' above-referenced rights as set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party to this Agreement, the parties agree as follows:

1.    **Assignment.**  In exchange for the payment of $10 by TCR Holdings to AIM Brands, the receipt and sufficiency of which is hereby acknowledged by AIM Brands, AIM Brands hereby assigns, transfers, and conveys to TCR Holdings (to the extent necessary in light of prior security interests of TCR):

(i) all of AIM Brands' right, title, and interest to the Arkansas Units (which is also evidenced by AIM Brands signing the Transfer of Title attached hereto as Exhibit D at the time it executes this Agreement); and

(ii) all of its right, title, and interest in the above referenced ICPO (including, but not limited to, all rights to claim and pursue payment from Axxcess Capital, in TCR Holdings' sole discretion, with any decision to pursue a claim, or to settle a claim in any amount, being within TCR Holdings' sole discretion).

AIM Brands also acknowledges the Security Interest of TCR Holdings in the KC Units and agrees to cooperate in any future assignment or sale of the KC Units that may be requested by TCR Holdings.

2.    **Use of funds and any shortfall.**  Any recovery of funds by TCR Holdings from Axxcess Capital or otherwise relating to the ICPO shall be distributed as follows, in the priority stated here:

i. first, to pay or reimburse TCR Holdings for all attorney fees and legal expenses incurred by TCR Holdings in connection with the recovery of the amounts at issue, including, but not limited to, any and all amounts incurred prior to signing this Agreement ;

ii. second, to satisfy the promissory note owed by AIM Brands to TCR Holdings and Fletcher Analytics;

iii. third, to AIM Brands , who will initiate the warrant conversion from Executed warrant agreement(s) Exhibit F

If the recovery of funds is insufficient to satisfy these notes including any accrued interest, fees and expenses, then AIM Brands shall still owe the additional remaining amounts under the notes to TCR Holdings and to Fletcher Analytics.  AIM Brands acknowledges that it owes TCR Holdings and Fletcher Analytics the full amounts provided under the promissory notes, (which as of May 11, 2021, is $10,729,178.08 owed to TCR Holdings -- including principal of $9,500,000.00 and Interest of $1,229,178.08 -- and $563,534.25 owed to Fletcher Analytics – including principal of - $500,000.00 and interest of $63,534.25 -- with additional amounts accruing under each note).

3.    **Cooperation, sale opportunities, and notice.**  AIM Brands agrees:

(i) to cooperate fully in any claim, litigation, or settlement that TCR Holdings elects to pursue, and to join the litigation to the extent necessary (including utilizing TCR's counsel as joint counsel and waiving any conflicts or potential conflicts that are ethically waivable in the use of such counsel); and

(ii) to pursue sales transactions for all of the Units.  All sales are subject to approval by TCR Holdings with notice of such sale (including price, quantity, buyer, and other material terms) required to be provided to TCR Holdings at least 48 hours prior to sale.  All funds in any sale transaction shall be wired to TCR Holdings by the third party per the wiring

instructions noted on Exhibit E hereto.  TCR Holdings shall cooperate in providing title as necessary for any sales transactions.  All proceeds shall be distributed by TCR Holdings as specified above in paragraph 2.

Notice of any sale or other issues shall be provided to the following email addresses: leslie.m.fletcher@gmail.com  and bill.uhrig@tcr-ny.com.

**4.**    **Integration.**  This Agreement, inclusive of its exhibits, constitutes the entire agreement between the Parties regarding the subject matter of this Agreement, and except where otherwise so stated in this Agreement, it supersedes any and all prior representations, commitments, covenants, warranties, statements, discussions, negotiations, understandings, or agreements, either oral or written, express or implied, regarding the subject matter of this Agreement.  The recitals set forth in this Agreement constitute part of the agreement between the parties and shall be binding on the parties.

**5.**    **Severability.**  If any term or provision of this Agreement, or the application thereof to any Party, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to any Party, other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Settlement shall be valid and be enforced to the fullest extent permitted by law.

**6.**    **Consultation With Counsel.**  Dinsmore & Shohl LLP has represented TCR Holdings and Fletcher Analytics for purposes of this Agreement. The other Parties represent that they have read and understand the meaning and effect of this Agreement and that they have had an opportunity to consult with an attorney, if desired, before executing this Agreement.

**7.**    **Mutual Preparation.**  The Parties agree that this Agreement is the product of the collaborative effort of the Parties and their counsel.  This Agreement shall not be construed against any Party on the basis that it is the author of or is otherwise responsible for any of the language of this Agreement.

**8.**    **No Modification or Amendment.**  No modification or amendment of this Agreement shall be valid or enforceable unless agreed to in a writing signed by each Party.

**9.**    **No Waiver.**  There shall be no waiver of any term or condition absent an express writing to that effect by the Party to be charged with that waiver.  No waiver of any term or condition in this Agreement by any Party shall be construed as a waiver of a subsequent breach or failure of the same term or condition, or waiver of any other term or condition of this Agreement.

**10.**    **Authority to Bind.**  Each of the Parties represents that its/his/her undersigned representative is fully authorized to enter into and bind it/him/her under this Agreement.

**11.**    **Governing Law, Jurisdiction, and Other Miscellaneous Provisions**.  This Agreement shall be construed under, and governed by, the laws of the State of Delaware.

**12.**    **Successors and Assigns.**  This Agreement shall be binding upon, and inure to the benefit of, the Parties and to each Party's respective legal representatives, successors, administrators, and assigns, as applicable.

**13.**    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile or electronic mail and shall become effective and

binding upon the Parties at such time as all the signatories hereto have signed the original or a counterpart of this Agreement.

IN WITNESS WHEREOF, and having read and understood all of the terms and conditions of this Agreement, the Parties have caused this Agreement to be executed as of the date set forth above.

| TCR Holdings, LLC | AIM BRANDS, LLC |
|---|---|
| By:   J. William Uhrig<br>Its:   Managing Member | By:   Christopher Nowlin<br>Its:   President |
| FLETCHER ANALYTICS, LLC<br><br>By:   Charles Fletcher<br>Its:   Managing Member | |

Ex. A

## AMENDED AND RESTATED
## PARTICIPATING PROMISSORY NOTE

Up to $9,500,000                                 Date: September [____], 2020

**FOR VALUE RECEIVED,** AIM BRANDS, LLC, a Delaware limited liability company ("*Borrower*" or "*Company*"), hereby promises to pay TCR HOLDINGS, LLC, a Delaware limited liability company ("*Lender*"), in lawful money of the United States of America and in immediately available funds, on or before the Maturity Date, the principal sum of NINE MILLION FIVE HUNDRED THOUSAND and 00/100 Dollars ($9,500,000.00) (the "*Maximum Principal Amount*"), together with accrued and unpaid interest thereon, or so much thereof as is loaned by Lender to Borrower in accordance with the terms and conditions of this Amended and Restated Participating Promissory Note (the "*Note*"). The parties acknowledge and agree that the outstanding balance of this Note (the "*Loan*") shall be maintained in the books and records of Lender and is not necessarily the face amount of this Note. The parties agree that Lender's books and records with respect to the Loan shall constitute *prima facie* evidence of the principal amount owing and unpaid on this Note, absent manifest error.

This Note is executed and delivered in connection with and as a condition to that certain Purchase Agreement for Participating Promissory Notes and Warrants (as the same may from time to time be amended, modified or supplemented, the "*Purchase Agreement*"), and that certain Warrant to Purchase Common Membership Interests (the "*Warrants*"), each of even date with this Note, by and between Borrower and Lender. Any disbursement of funds under this Note ("*Proceeds*") to Borrower under this Note shall be subject to the terms and conditions of the Purchase Agreement. Capitalized terms that are used but not specifically defined in this Note will have the meanings given to that term in the Purchase Agreement.

This Note amends, restates, and supersedes all prior promissory notes and similar instruments evidencing the indebtedness of Borrower to Lender as of the effective date set out above (the "*Effective Date*"), including, but not limited to, the prior Senior Secured Participating Promissory Note in the principal amount of $6,000,000, dated June 5, 2020 (the "*Prior Note*"). For the sake of clarity, Borrower and Lender desire by this Note to combine, amend, and restate the Prior Note and all other prior promissory notes and similar instruments into this single, restated Note. Borrower and Lender further desire to confirm, and give notice to third parties, that this Note is not intended and shall not be construed to impair, extinguish, or otherwise adversely affect any security interests granted to Lender pursuant to the Prior Note and any other prior promissory note or similar instrument, which shall continue in full force and effect, except as expressly modified by this Note, as further set out below.

1.    **Loan and Proceeds**.

     a.   **Maximum Loan.** Subject to the terms and conditions of this Note and the Purchase Agreement, Lender agrees to make available to Borrower up to the Maximum Principal Amount, as may be requested by Borrower from time to time.

     b.   **Inclusion of Prior Loans**. Lender has previously made loans to Borrower under prior promissory notes and similar instruments, including, but not limited to, the Prior Note. Borrower and Lender agree that it is their mutual intent for all such prior indebtedness (including, but not limited to, all indebtedness under the Prior Note) to be evidenced by and included in the balance of outstanding Loan principal under this Note. For the sake of clarity, Borrower and Lender agree that the outstanding principal balance of the Loan under this Note as of the Effective Date is $9,500,000.00 (the "*Effective Date Loan Balance*"), which represents Borrower's entire indebtedness to Lender as of the Effective Date. All subsequent disbursements of Proceeds to Borrower under this Note shall be added to the Effective Date Loan Balance.

     c.   **Requests for Loan Disbursements**. Borrower may request disbursements of Proceeds under this Note by providing written notice to Lender (each, a "*Request for Proceeds*"). Borrower shall make each Request for Proceeds at least three (3) days prior to the date that Borrower wishes to receive such Proceeds. Each Request for Proceeds shall (i) specify the aggregate amount of Proceeds requested; (ii) describe in sufficient detail the Business Unit for which the request is being made. Notwithstanding any other provision of this Note, the granting of all Requests for Proceeds shall at all times be subject to the discretion of Lender, which shall not

be unreasonably withheld if such request is made consistent with the terms and conditions of this Note and the Purchase Agreement.

    d.   **Use of Proceeds; Controls**. Borrower shall use all Proceeds exclusively for the Business, as is further set out in the Purchase Agreement. Borrower and Lender shall cooperate and jointly manage the use of all Proceeds in accordance with the account control terms and conditions set out in Purchase Agreement, including, but not limited to, the use of segregated accounts for the Business.

    2.    **Principal Repayment**. Borrower shall repay to Lender the outstanding principal amount of the Loan on or before August 1, 2021 (the "*Maturity Date*"). Borrower may prepay this Note in whole or in part at any time prior to the Maturity Date without premium or penalty. In the event of any payment or prepayment, Borrower shall pay Lender any interest accrued but not paid.

    3.    **Interest Rate**. The Loan shall bear interest at the rate of Fifteen Percent (15%) per annum ("*Interest*"). For the sake of clarity, Borrower's liability for payment of Interest shall be calculated with respect to Proceeds actually disbursed and from the date of each such disbursement until the Loan has been repaid in full. Interest shall be calculated on a simple interest basis using the actual calendar days of the year. Interest shall be due and payable in quarterly installments on or before the fifth (5th) calendar day of January, April, July, and October. Upon repayment of the entire Loan, Borrower will pay the final quarterly Interest payment for the actual number of days in the quarter for which an interest payment had not been made.

    4.    **Lender Participation Interest**. Without limiting and in addition to the foregoing, if Borrower declares any distribution of cash on the outstanding units of Membership Interest of Borrower (the "*Borrower Membership Interests*") at any time while this Note and the Warrants are outstanding, Lender will be entitled to receive, and Borrower will pay to Lender at the same time such distribution is paid to the members of Borrower, an amount initially equal to Nineteen Percent (19%) of the total declared distribution (the "*Lender Participation Interest*," as adjusted in accordance with the provisions below). By way of example, and for the sake of clarity only, if Borrower declares a distribution of $1.00 cash on the outstanding Borrower Membership Interests while the Note and the Warrants are outstanding, then $0.77 of the declared distribution would be paid to the Borrower's Members in accordance with the Borrower Membership Interests, and $0.19 of the declared distribution would be paid to Lender, and $0.04 of the declared distribution would be paid to Fletcher Analytics, LLC, in accordance with the Purchase Agreement.

The Lender Participation Interest will be subject to adjustment as follows: in the event of one or more Diluting Events (as defined in the Purchase Agreement) prior to the exercise of the Warrants, the percentage of distributions payable to Lender as the Lender Participation Interest will be reduced to equal Lender's respective Adjusted Warrant Percentage (as defined in the Purchase Agreement), which the parties will calculate on an as-if-exercised basis in order to determine the appropriate Lender Participation Interest at that time. Payment of the Lender Participation Interest to Lender shall not constitute payment of either principal or interest under this Note. Borrower acknowledges and agrees that Lender's entitlement to and receipt of the Lender Participation Interest is material consideration for the Loan, and that Borrower would not have entered into the Purchase Agreement or this Note without the inclusion of the Lender Participation Interest.

    Notwithstanding the foregoing, upon the exercise of the Warrants by Lender, and the corresponding issuance of the Warrant Units to Lender, the Lender Participation Interest will automatically, without any further action being required of the parties, terminate and cancel. Borrower and Lender acknowledge that under the foregoing circumstances the Lender Participation Interest will terminate even if this Note remains outstanding. For the sake of clarity, it is the parties' mutual intent to provide Lender with (a) the right to receive payment of the principal and interest under the terms and conditions of this Note and (b) the right to receive payment of the Lender Participation Interest, unless and until Borrower issues the Warrant Units to Lender upon exercise of the Warrants, after which Lender will not receive the Lender Participation Interest and Lender will only have those rights associated with the Warrant Units, as governed by the terms and conditions of the Governing Documents of Borrower, as then amended.

    5.    **Place of Payment**. All amounts of interest and principal payable under this Note shall be payable to Lender at the address and account specified by Lender to Borrower in writing.

    6.    **Application of Payments.** Any payments on this Note shall be applied first to accrued interest, and thereafter to the outstanding principal balance hereof.

7.      **Secured Obligation**. Except as otherwise expressly set out in this Note, Borrower hereby grants to Lender a first priority lien and security interest in, to and under all of the following assets of Borrower (collectively, the "*Collateral*") to secure the payment and performance by Borrower under this Note, the Purchase Agreement, and all other Related Documents:

      a.      all accounts, accounts receivable, contract rights, general intangibles, chattel paper, notes, drafts, acceptances, and all other debts, obligations and liabilities in whatever form owing to Borrower from any person, firm, corporation or other legal entity whether now existing or hereafter arising or acquired;

      b.      all now owned or hereafter acquired and wherever located goods, merchandise and other personal property which are held for sale or lease or to be furnished under contracts of service or held as raw materials, work in process or finished goods and supplies or materials used or consumed in Borrower's business or used in connection with the manufacture, packing, shipping, advertising or furnishing of such goods;

      c.      all now existing or hereafter acquired machinery, equipment, furniture and fixtures, including spare parts, replacements, substitutions, additions or accessions thereto, wherever located;

      d.      all documents, policies and certificates of insurance and chooses in action, whether now or hereafter existing;

      e.      all instruments, securities and cash owned by Borrower or in which Borrower has an interest, which now or hereafter are at any time in possession or control of Lender or in transit by mail or carrier to or from Lender or in the possession of any third party acting on Lender's behalf, without regard to whether Lender received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Lender has conditionally released the same;

      f.      all books, records, ledger sheets and other records relating to the foregoing;

      g.      all customer lists, purchase orders, contract rights, trademarks, trade names, copyrights, patents, processes, and all applications therefor, know-how, trade secrets, confidential information, goodwill, assumed names, and all other intellectual property; and

      h.      all proceeds, products, offspring, rents and profits of the foregoing, including, without limitation, proceeds of insurance.

8.      **Relationship to Prior Notes**. Borrower hereby reaffirms, ratifies, acknowledges and agrees all security interests established by all prior promissory notes and similar instruments evidencing the indebtedness of Borrower to Lender as of the Effective Date, including, but not limited to, the Prior Note, as modified hereby. None of the prior liens or security interests granted in or created by the Prior Note or other similar prior instruments are released or shall be deemed released, as a result of this Note, nor shall said liens and security interests, or the priority or validity thereof, be adversely affected by this Note. This Note shall not constitute a novation of the prior liens and security interests. It is understood by and is the intention of the parties to this Note that any legal or equitable priorities of Lender over any party which were in existence before the date of execution of this Note shall remain in effect after the execution of this Note. At the request of Lender, Borrower will join with Lender in executing a security agreement in form satisfactory to Lender to evidence the foregoing.

9.      **Other Liens**. As of the date hereof, there are no other liens, claims, security interests or other encumbrances ("*Liens*") attaching to the Collateral except for those in favor of this Note (including those granted in or created by the Prior Note and other similar prior instruments among Borrower and Lender) and the Purchase Agreement. At the request of Lender, Borrower will join with Lender in executing one or more financing statements pursuant to the Uniform Commercial Code (the "*Code*") in form satisfactory to Lender. Borrower hereby authorizes Lender to file a financing statement signed only by Lender in all places where necessary to perfect Lender's security interest in the Collateral in all jurisdictions where such authorization is permitted by the Code. Borrower further agrees to immediately prepare all such financing statements and submit said statement to Lender. Without limiting the foregoing, Borrower agrees that whenever the Code requires Borrower to sign a financing statement for filing purposes, Borrower hereby appoints Lender or any of Lender's representatives as Borrower's attorney and agent, with full power of substitution, to sign or endorse Borrower's name on any such financing statement or other document and authorizes Lender to file such a financing statement in all places where necessary to perfect Lender's security interest in the Collateral. A carbon, photographic or other reproduction of this Note or of a financing statement is sufficient as a financing statement. Upon full payment of all obligations under this Note, the Lien or charge created hereby or

3

resulting herefrom, shall cease to exist and Lender shall file all termination statements requested by Borrower necessary to accomplish this purpose.

10.    **Related Documents; Simultaneous Effectiveness**. The parties agree that, simultaneous with execution and delivery of this Note, the parties will also execute and deliver the Purchase Agreement and all other Related Documents (as defined in the Purchase Agreement). The parties acknowledge that the execution and delivery of this Note (and all attachments, schedules, and instruments referenced in the Note, including the Purchase Agreement and the Related Documents), as well as all actions to be taken and all transactions to be consummated at or before Closing (as defined in the Purchase Agreement), will have simultaneous effectiveness as part of a group of interrelated agreements. The delivery of all agreements, instruments, and documents required under this Note (and all attachments, schedules, and instruments referenced in the Note, including the Purchase Agreement and the Related Documents), and the effectiveness of all actions and transactions to be consummated at or before Closing (as defined in the Purchase Agreement), will be deemed to have been made in escrow until all such applicable agreements, instruments, documents, actions, and transactions have been completed.

11.    **Events of Default; Acceleration**. Each the following occurrences shall constitute an event of default under this Note (each, an "*Event of Default*"):

    a.    Borrower shall be involved in financial difficulties as evidenced: (i) by its commencement of a voluntary case under Title 11 of the United States Code as from time to time in effect; (ii) by its filing an answer or other pleading admitting or failing to deny the material allegations of a petition filed against it commencing an involuntary case under said Title 11, or seeking, consenting to or acquiescing in the relief therein provided, or by its failing to controvert timely the material allegations of any such petition; (iii) by the entry of an order for relief in any involuntary case commenced under said Title 11; (iv) by the entry of an order by a court of competent jurisdiction (A) by finding it to be bankrupt or insolvent, (B) ordering or approving its liquidation, reorganization or any modification or alteration of the rights of its creditors, or (C) assuming custody of, or appointing a receiver or other custodian for all or a substantial part of its property and such order shall not be vacated or stayed on appeal or otherwise stayed within 120 days; (v) by the filing of a petition against the Borrower under said Title 11 which shall not be vacated within 120 days; or (vi) by its making an assignment for the benefit of, its creditors, or appointing or consenting to the appointment of a receiver or other custodian for all or a substantial part of its property;

    b.    Borrower shall sell substantially all of its assets to an unaffiliated third party in one or more of a series of related transactions;

    c.    Borrower shall fail to make a payment of any installment of the outstanding principal or interest amount of this Note (whether by acceleration or otherwise), which failure or breach shall not be cured within 30 days after written notice thereof from Lender to the Borrower; or

    d.    if the Proceeds of the Loan evidenced by this Note have been used other than for the Business.

In any such Event of Default, and at any time thereafter if the Event of Default shall be continuing, at the option of Lender and upon written notice to the Borrower, the outstanding principal of any and all accrued but unpaid interest in respect of this Note shall be immediately due and payable upon delivery of such written notice, without presentment, demand, protest or any other notice of any kind being required, all of which are hereby expressly waived by Borrower.

12.    **Authorization**. Borrower has the full power and authority to execute and deliver this Note and to consummate the transactions contemplated on its part hereby and thereby. The execution, delivery (or filing or adoption, as the case may be), and performance by Borrower of this Note have been duly authorized by Borrower. This Note is a valid and binding agreement of Borrower, enforceable against the Borrower in accordance with its terms, except as limited by bankruptcy, insolvency and other laws affecting the enforcement of creditors' rights generally and by equitable principles in any action (legal or equitable) and by public policy.

13.    **Modification; Waiver**. No modification or waiver of any provision of this Note will be effective except on the written consent of the parties.

14.    **Governing Law**. This Agreement will be governed by and construed under the laws of Delaware without giving effect to conflicts of law principles; provided, however, that the laws of Arkansas will apply to the extent of procedural

<div align="center">4</div>

and substantive matters relating only to the creation, perfection, foreclosure of liens, and enforcement of rights and remedies against the Collateral.

15.   **Transfers, Successors and Assigns.** The provisions of this Note shall inure to the benefit of and be binding on any successor to the parties, and shall extend to any holder hereof. Lender may not, without the prior written consent of Borrower (such consent not to be unreasonably withheld and such consent not to be required if an Event of Default exists), assign, transfer or negotiate this Note to any third party. Any such transfer or assignment must be in full compliance with applicable securities laws.

16.   **Arbitration; Forum**. Any dispute arising from or relating to the subject matter of this Agreement that is not voluntarily resolved by the parties must be finally settled by arbitration in Benton County, Arkansas, in accordance with the rules then in effect of the American Arbitration Association or its successor, and consistent with the requirements and standards of the Federal Arbitration Act or its successor. Judgment on or enforcement of the arbitration award may be entered in any court having jurisdiction. Any arbitration under this Agreement will take place on an individual basis. Notwithstanding the previous obligations, each party will have the right to start an action at any time for injunctive relief exclusively in the federal or state courts having jurisdiction in Benton County, Arkansas. In such an event, the parties agree that only the claims for injunctive relief will be permissible through a suit or similar proceeding, and all other disputes of the parties will be mandatorily subject to the arbitration provision set out above. The prevailing party in any such action, whether arbitration or an injunctive relief, will be entitled to receive an award of costs and expenses (including reasonable attorneys' fees).

17.   **Usury**. Without limiting any of the other terms of this Note, the Purchase Agreement, or any other Related Document (collectively, the "*Loan Documents*"), in no event shall the interest rate provided for under this Note, together with all fees and charges as provided for in this Note or in any other Loan Document which are treated as interest under applicable law (collectively, "*Charges*"), exceed the maximum rate legally chargeable by Lender under applicable law for loans of the type provided for under this Note (the "*Maximum Rate*"). If, in any month, the Charges, absent such limitation, would have exceeded the Maximum Rate, then the Charges for that month shall be at the Maximum Rate, and, if in future months, such Charges would otherwise be less than the Maximum Rate, then such Charges shall remain at the Maximum Rate until such time as the amount of Charges paid hereunder and under the other Loan Documents equals the amount of Charges which would have been paid if the same had not been limited by the Maximum Rate. In the event that, upon payment in full of all obligations under the Loan Documents (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted), the total amount of Charges paid or accrued in respect of the total indebtedness evidenced by this Note and the other obligations under the Loan Documents is less than the total amount of Charges which would, but for this paragraph, have been paid or accrued if the Charges otherwise set forth in this Note and in the other Loan Documents had at all times been in effect, then Borrower shall, to the extent permitted by applicable law, pay to Lender an amount equal to the difference between: (a) the lesser of: (i) the amount of Charges which would have been charged if the Maximum Rate had, at all times, been in effect or (ii) the amount of Charges which would have accrued had such Charges otherwise provided for in this Note and in the other Loan Documents at all times been in effect and (b) the amount of Charges actually paid or accrued in respect of the total indebtedness evidenced by this Note or any of the other Loan Documents. In the event that a court of competent jurisdiction determines that Lender has received any Charges in respect of the indebtedness evidenced by this Note and the other Loan Documents in excess of the Maximum Rate, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the obligations under the Loan Documents owed to Lender other than any Charges, in the inverse order of maturity, and if there are no obligations under the Loan Documents to Lender outstanding, Lender shall refund to Borrower (or to such Person to which Lender is directed by a court of competent jurisdiction) such excess.

*[ Signatures are on the following page. ]*

5

IN WITNESS OF AGREEMENT, the undersigned parties execute this AMENDED AND RESTATED PARTICIPATING PROMISSORY NOTE, dated and effective as of September [   ], 2020.

TCR HOLDINGS, LLC

By: _____

Name: J. William Uhrig

Title: Managing Member

Address: C/o Three Cities Research, Inc.
135 E 57th St. 15-103, New York, NY 10022

Email: Uhrig@tcr-ny.com

AIM BRANDS, LLC

By: _____

Name: Christopher S. Nardin

Title: Managing Director

Address: 1000 Sw West park Dr.
Bentonville, AR 72712

Email: Kdowling@aimbrands.net

Ex. B

## AMENDED AND RESTATED
## PARTICIPATING PROMISSORY NOTE

Up to $500,000                                                    Date: September [____], 2020

**FOR VALUE RECEIVED,** AIM BRANDS, LLC, a Delaware limited liability company ("*Borrower*" or "*Company*"), hereby promises to pay FLETCHER ANALYTICS, LLC, a Delaware limited liability company ("*Lender*"), in lawful money of the United States of America and in immediately available funds, on or before the Maturity Date, the principal sum of FIVE HUNDRED THOUSAND and 00/100 Dollars ($500,000.00) (the "*Maximum Principal Amount*"), together with accrued and unpaid interest thereon, or so much thereof as is loaned by Lender to Borrower in accordance with the terms and conditions of this Amended and Restated Participating Promissory Note (the "*Note*"). The parties acknowledge and agree that the outstanding balance of this Note (the "*Loan*") shall be maintained in the books and records of Lender and is not necessarily the face amount of this Note. The parties agree that Lender's books and records with respect to the Loan shall constitute *prima facie* evidence of the principal amount owing and unpaid on this Note, absent manifest error.

This Note is executed and delivered in connection with and as a condition to that certain Purchase Agreement for Participating Promissory Notes and Warrants (as the same may from time to time be amended, modified or supplemented, the "*Purchase Agreement*"), and that certain Warrant to Purchase Common Membership Interests (the "*Warrants*"), each of even date with this Note, by and between Borrower and Lender. Any disbursement of funds under this Note ("*Proceeds*") to Borrower under this Note shall be subject to the terms and conditions of the Purchase Agreement. Capitalized terms that are used but not specifically defined in this Note will have the meanings given to that term in the Purchase Agreement.

This Note amends, restates, and supersedes all prior promissory notes and similar instruments evidencing the indebtedness of Borrower to Lender as of the effective date set out above (the "*Effective Date*"), including, but not limited to, all prior promissory notes (collectively, if any, the "*Prior Notes*"). For the sake of clarity, Borrower and Lender desire by this Note to combine, amend, and restate the Prior Notes and all other prior promissory notes and similar instruments into this single, restated Note. Borrower and Lender further desire to confirm, and give notice to third parties, that this Note is not intended and shall not be construed to impair, extinguish, or otherwise adversely affect any security interests granted to Lender pursuant to the Prior Notes and any other prior promissory note or similar instrument, which shall continue in full force and effect, except as expressly modified by this Note, as further set out below.

1.   **Loan and Proceeds**.

   a.   **Maximum Loan.** Subject to the terms and conditions of this Note and the Purchase Agreement, Lender agrees to make available to Borrower up to the Maximum Principal Amount, as may be requested by Borrower from time to time.

   b.   **Inclusion of Prior Loans**. Lender has previously made loans to Borrower under prior promissory notes and similar instruments, including, but not limited to, the Prior Notes. Borrower and Lender agree that it is their mutual intent for all such prior indebtedness (including, but not limited to, all indebtedness under the Prior Notes) to be evidenced by and included in the balance of outstanding Loan principal under this Note. For the sake of clarity, Borrower and Lender agree that the outstanding principal balance of the Loan under this Note as of the Effective Date is $500,000.00 (the "*Effective Date Loan Balance*"), which represents Borrower's entire indebtedness to Lender as of the Effective Date. All subsequent disbursements of Proceeds to Borrower under this Note shall be added to the Effective Date Loan Balance.

   c.   **Requests for Loan Disbursements**. Borrower may request disbursements of Proceeds under this Note by providing written notice to Lender (each, a "*Request for Proceeds*"). Borrower shall make each Request for Proceeds at least three (3) days prior to the date that Borrower wishes to receive such Proceeds. Each Request for Proceeds shall (i) specify the aggregate amount of Proceeds requested; (ii) describe in sufficient detail the Business Unit for which the request is being made. Notwithstanding any other provision of this Note, the granting of all Requests for Proceeds shall at all times be subject to the discretion of Lender, which shall not

be unreasonably withheld if such request is made consistent with the terms and conditions of this Note and the Purchase Agreement.

d. **Use of Proceeds; Controls**. Borrower shall use all Proceeds exclusively for the Business, as is further set out in the Purchase Agreement. Borrower and Lender shall cooperate and jointly manage the use of all Proceeds in accordance with the account control terms and conditions set out in Purchase Agreement, including, but not limited to, the use of segregated accounts for the Business.

2.      **Principal Repayment**. Borrower shall repay to Lender the outstanding principal amount of the Loan on or before August 1, 2021 (the "*Maturity Date*"). Borrower may prepay this Note in whole or in part at any time prior to the Maturity Date without premium or penalty. In the event of any payment or prepayment, Borrower shall pay Lender any interest accrued but not paid.

3.      **Interest Rate**. The Loan shall bear interest at the rate of Fifteen Percent (15%) per annum ("*Interest*"). For the sake of clarity, Borrower's liability for payment of Interest shall be calculated with respect to Proceeds actually disbursed and from the date of each such disbursement until the Loan has been repaid in full. Interest shall be calculated on a simple interest basis using the actual calendar days of the year. Interest shall be due and payable in quarterly installments on or before the fifth (5th) calendar day of January, April, July, and October. Upon repayment of the entire Loan, Borrower will pay the final quarterly Interest payment for the actual number of days in the quarter for which an interest payment had not been made.

4.      **Lender Participation Interest**. Without limiting and in addition to the foregoing, if Borrower declares any distribution of cash on the outstanding units of Membership Interest of Borrower (the "*Borrower Membership Interests*") at any time while this Note and the Warrants are outstanding, Lender will be entitled to receive, and Borrower will pay to Lender at the same time such distribution is paid to the members of Borrower, an amount initially equal to Four Percent (4%) of the total declared distribution (the "*Lender Participation Interest*," as adjusted in accordance with the provisions below). By way of example, and for the sake of clarity only, if Borrower declares a distribution of $1.00 cash on the outstanding Borrower Membership Interests while the Note and the Warrants are outstanding, then $0.77 of the declared distribution would be paid to the Borrower's Members in accordance with the Borrower Membership Interests, and $0.04 of the declared distribution would be paid to Lender, and $0.19 of the declared distribution would be paid to TCR Holdings, LLC, in accordance with the Purchase Agreement.

The Lender Participation Interest will be subject to adjustment as follows: in the event of one or more Diluting Events (as defined in the Purchase Agreement) prior to the exercise of the Warrants, the percentage of distributions payable to Lender as the Lender Participation Interest will be reduced to equal Lender's respective Adjusted Warrant Percentage (as defined in the Purchase Agreement), which the parties will calculate on an as-if-exercised basis in order to determine the appropriate Lender Participation Interest at that time. Payment of the Lender Participation Interest to Lender shall not constitute payment of either principal or interest under this Note. Borrower acknowledges and agrees that Lender's entitlement to and receipt of the Lender Participation Interest is material consideration for the Loan, and that Borrower would not have entered into the Purchase Agreement or this Note without the inclusion of the Lender Participation Interest.

Notwithstanding the foregoing, upon the exercise of the Warrants by Lender, and the corresponding issuance of the Warrant Units to Lender, the Lender Participation Interest will automatically, without any further action being required of the parties, terminate and cancel. Borrower and Lender acknowledge that under the foregoing circumstances the Lender Participation Interest will terminate even if this Note remains outstanding. For the sake of clarity, it is the parties' mutual intent to provide Lender with (a) the right to receive payment of the principal and interest under the terms and conditions of this Note and (b) the right to receive payment of the Lender Participation Interest, unless and until Borrower issues the Warrant Units to Lender upon exercise of the Warrants, after which Lender will not receive the Lender Participation Interest and Lender will only have those rights associated with the Warrant Units, as governed by the terms and conditions of the Governing Documents of Borrower, as then amended.

5.      **Place of Payment**. All amounts of interest and principal payable under this Note shall be payable to Lender at the address and account specified by Lender to Borrower in writing.

6.      **Application of Payments.** Any payments on this Note shall be applied first to accrued interest, and thereafter to the outstanding principal balance hereof.

2

7.      **Secured Obligation**. Except as otherwise expressly set out in this Note, Borrower hereby grants to Lender a first priority lien and security interest in, to and under all of the following assets of Borrower (collectively, the "*Collateral*") to secure the payment and performance by Borrower under this Note, the Purchase Agreement, and all other Related Documents:

a.   all accounts, accounts receivable, contract rights, general intangibles, chattel paper, notes, drafts, acceptances, and all other debts, obligations and liabilities in whatever form owing to Borrower from any person, firm, corporation or other legal entity whether now existing or hereafter arising or acquired;

b.   all now owned or hereafter acquired and wherever located goods, merchandise and other personal property which are held for sale or lease or to be furnished under contracts of service or held as raw materials, work in process or finished goods and supplies or materials used or consumed in Borrower's business or used in connection with the manufacture, packing, shipping, advertising or furnishing of such goods;

c.   all now existing or hereafter acquired machinery, equipment, furniture and fixtures, including spare parts, replacements, substitutions, additions or accessions thereto, wherever located;

d.   all documents, policies and certificates of insurance and choses in action, whether now or hereafter existing;

e.   all instruments, securities and cash owned by Borrower or in which Borrower has an interest, which now or hereafter are at any time in possession or control of Lender or in transit by mail or carrier to or from Lender or in the possession of any third party acting on Lender's behalf, without regard to whether Lender received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Lender has conditionally released the same;

f.   all books, records, ledger sheets and other records relating to the foregoing;

g.   all customer lists, purchase orders, contract rights, trademarks, trade names, copyrights, patents, processes, and all applications therefor, know-how, trade secrets, confidential information, goodwill, assumed names, and all other intellectual property; and

h.   all proceeds, products, offspring, rents and profits of the foregoing, including, without limitation, proceeds of insurance.

8.      **Relationship to Prior Notes**. Borrower hereby reaffirms, ratifies, acknowledges and agrees all security interests established by all prior promissory notes and similar instruments evidencing the indebtedness of Borrower to Lender as of the Effective Date, including, but not limited to, the Prior Notes, as modified hereby. None of the prior liens or security interests granted in or created by the Prior Notes or other similar prior instruments are released or shall be deemed released, as a result of this Note, nor shall said liens and security interests, or the priority or validity thereof, be adversely affected by this Note. This Note shall not constitute a novation of the prior liens and security interests. It is understood by and is the intention of the parties to this Note that any legal or equitable priorities of Lender over any party which were in existence before the date of execution of this Note shall remain in effect after the execution of this Note. At the request of Lender, Borrower will join with Lender in executing a security agreement in form satisfactory to Lender to evidence the foregoing.

9.      **Other Liens**. As of the date hereof, there are no other liens, claims, security interests or other encumbrances ("*Liens*") attaching to the Collateral except for those in favor of this Note (including those granted in or created by the Prior Notes and other similar prior instruments among Borrower and Lender) and the Purchase Agreement. At the request of Lender, Borrower will join with Lender in executing one or more financing statements pursuant to the Uniform Commercial Code (the "*Code*") in form satisfactory to Lender. Borrower hereby authorizes Lender to file a financing statement signed only by Lender in all places where necessary to perfect Lender's security interest in the Collateral in all jurisdictions where such authorization is permitted by the Code. Borrower further agrees to immediately prepare all such financing statements and submit said statement to Lender. Without limiting the foregoing, Borrower agrees that whenever the Code requires Borrower to sign a financing statement for filing purposes, Borrower hereby appoints Lender or any of Lender's representatives as Borrower's attorney and agent, with full power of substitution, to sign or endorse Borrower's name on any such financing statement or other document and authorizes Lender to file such a financing statement in all places where necessary to perfect Lender's security interest in the Collateral. A carbon, photographic or other reproduction of this Note or of a financing statement is sufficient as a financing statement. Upon full payment of all obligations under this Note, the Lien or charge created hereby or

3

resulting herefrom, shall cease to exist and Lender shall file all termination statements requested by Borrower necessary to accomplish this purpose.

10. **Related Documents; Simultaneous Effectiveness**. The parties agree that, simultaneous with execution and delivery of this Note, the parties will also execute and deliver the Purchase Agreement and all other Related Documents (as defined in the Purchase Agreement). The parties acknowledge that the execution and delivery of this Note (and all attachments, schedules, and instruments referenced in the Note, including the Purchase Agreement and the Related Documents), as well as all actions to be taken and all transactions to be consummated at or before Closing (as defined in the Purchase Agreement), will have simultaneous effectiveness as part of a group of interrelated agreements. The delivery of all agreements, instruments, and documents required under this Note (and all attachments, schedules, and instruments referenced in the Note, including the Purchase Agreement and the Related Documents), and the effectiveness of all actions and transactions to be consummated at or before Closing (as defined in the Purchase Agreement), will be deemed to have been made in escrow until all such applicable agreements, instruments, documents, actions, and transactions have been completed.

11. **Events of Default; Acceleration**. Each the following occurrences shall constitute an event of default under this Note (each, an "*Event of Default*"):

a. Borrower shall be involved in financial difficulties as evidenced: (i) by its commencement of a voluntary case under Title 11 of the United States Code as from time to time in effect; (ii) by its filing an answer or other pleading admitting or failing to deny the material allegations of a petition filed against it commencing an involuntary case under said Title 11, or seeking, consenting to or acquiescing in the relief therein provided, or by its failing to controvert timely the material allegations of any such petition; (iii) by the entry of an order for relief in any involuntary case commenced under said Title 11; (iv) by the entry of an order by a court of competent jurisdiction (A) by finding it to be bankrupt or insolvent, (B) ordering or approving its liquidation, reorganization or any modification or alteration of the rights of its creditors, or (C) assuming custody of, or appointing a receiver or other custodian for all or a substantial part of its property and such order shall not be vacated or stayed on appeal or otherwise stayed within 120 days; (v) by the filing of a petition against the Borrower under said Title 11 which shall not be vacated within 120 days; or (vi) by its making an assignment for the benefit of, its creditors, or appointing or consenting to the appointment of a receiver or other custodian for all or a substantial part of its property;

b. Borrower shall sell substantially all of its assets to an unaffiliated third party in one or more of a series of related transactions;

c. Borrower shall fail to make a payment of any installment of the outstanding principal or interest amount of this Note (whether by acceleration or otherwise), which failure or breach shall not be cured within 30 days after written notice thereof from Lender to the Borrower; or

d. if the Proceeds of the Loan evidenced by this Note have been used other than for the Business.

In any such Event of Default, and at any time thereafter if the Event of Default shall be continuing, at the option of Lender and upon written notice to the Borrower, the outstanding principal of any and all accrued but unpaid interest in respect of this Note shall be immediately due and payable upon delivery of such written notice, without presentment, demand, protest or any other notice of any kind being required, all of which are hereby expressly waived by Borrower.

12. **Authorization**. Borrower has the full power and authority to execute and deliver this Note and to consummate the transactions contemplated on its part hereby and thereby. The execution, delivery (or filing or adoption, as the case may be), and performance by Borrower of this Note have been duly authorized by Borrower. This Note is a valid and binding agreement of Borrower, enforceable against the Borrower in accordance with its terms, except as limited by bankruptcy, insolvency and other laws affecting the enforcement of creditors' rights generally and by equitable principles in any action (legal or equitable) and by public policy.

13. **Modification; Waiver**. No modification or waiver of any provision of this Note will be effective except on the written consent of the parties.

14. **Governing Law**. This Agreement will be governed by and construed under the laws of Delaware without giving effect to conflicts of law principles; provided, however, that the laws of Arkansas will apply to the extent of procedural

4

and substantive matters relating only to the creation, perfection, foreclosure of liens, and enforcement of rights and remedies against the Collateral.

15.     **Transfers, Successors and Assigns.** The provisions of this Note shall inure to the benefit of and be binding on any successor to the parties, and shall extend to any holder hereof. Lender may not, without the prior written consent of Borrower (such consent not to be unreasonably withheld and such consent not to be required if an Event of Default exists), assign, transfer or negotiate this Note to any third party. Any such transfer or assignment must be in full compliance with applicable securities laws.

16.     **Arbitration; Forum**. Any dispute arising from or relating to the subject matter of this Agreement that is not voluntarily resolved by the parties must be finally settled by arbitration in Benton County, Arkansas, in accordance with the rules then in effect of the American Arbitration Association or its successor, and consistent with the requirements and standards of the Federal Arbitration Act or its successor. Judgment on or enforcement of the arbitration award may be entered in any court having jurisdiction. Any arbitration under this Agreement will take place on an individual basis. Notwithstanding the previous obligations, each party will have the right to start an action at any time for injunctive relief exclusively in the federal or state courts having jurisdiction in Benton County, Arkansas. In such an event, the parties agree that only the claims for injunctive relief will be permissible through a suit or similar proceeding, and all other disputes of the parties will be mandatorily subject to the arbitration provision set out above. The prevailing party in any such action, whether arbitration or an injunctive relief, will be entitled to receive an award of costs and expenses (including reasonable attorneys' fees).

17.     **Usury**. Without limiting any of the other terms of this Note, the Purchase Agreement, or any other Related Document (collectively, the "*Loan Documents*"), in no event shall the interest rate provided for under this Note, together with all fees and charges as provided for in this Note or in any other Loan Document which are treated as interest under applicable law (collectively, "*Charges*"), exceed the maximum rate legally chargeable by Lender under applicable law for loans of the type provided for under this Note (the "*Maximum Rate*"). If, in any month, the Charges, absent such limitation, would have exceeded the Maximum Rate, then the Charges for that month shall be at the Maximum Rate, and, if in future months, such Charges would otherwise be less than the Maximum Rate, then such Charges shall remain at the Maximum Rate until such time as the amount of Charges paid hereunder and under the other Loan Documents equals the amount of Charges which would have been paid if the same had not been limited by the Maximum Rate. In the event that, upon payment in full of all obligations under the Loan Documents (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted), the total amount of Charges paid or accrued in respect of the total indebtedness evidenced by this Note and the other obligations under the Loan Documents is less than the total amount of Charges which would, but for this paragraph, have been paid or accrued if the Charges otherwise set forth in this Note and in the other Loan Documents had at all times been in effect, then Borrower shall, to the extent permitted by applicable law, pay to Lender an amount equal to the difference between: (a) the lesser of: (i) the amount of Charges which would have been charged if the Maximum Rate had, at all times, been in effect or (ii) the amount of Charges which would have accrued had such Charges otherwise provided for in this Note and in the other Loan Documents at all times been in effect and (b) the amount of Charges actually paid or accrued in respect of the total indebtedness evidenced by this Note or any of the other Loan Documents. In the event that a court of competent jurisdiction determines that Lender has received any Charges in respect of the indebtedness evidenced by this Note and the other Loan Documents in excess of the Maximum Rate, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the obligations under the Loan Documents owed to Lender other than any Charges, in the inverse order of maturity, and if there are no obligations under the Loan Documents to Lender outstanding, Lender shall refund to Borrower (or to such Person to which Lender is directed by a court of competent jurisdiction) such excess.

*[ Signatures are on the following page. ]*

Exhibit E, page 028

**IN WITNESS OF AGREEMENT**, the undersigned parties execute this AMENDED AND RESTATED PARTICIPATING PROMISSORY NOTE, dated and effective as of September [24ᵗʰ], 2020.

**FLETCHER ANALYTICS, LLC**

By: _C. Brandon Fletcher_

Name: _C. Brandon Fletcher_

Title: _Managing Member_

Address: _1005 NE 2nd Street_

_Bentonville AR 72712_

Email: _Fletcher @ aimbrands.net_

**AIM BRANDS, LLC**

By: _Chris Nowlin_

Name: _Christopher Nowlin_

Title: _Managing Director_

Address: _1000 SW ~~Bentonville~~ Dr._

_Bentonville, AR 72712_

Email: _Kitnowlin @ aimbrands.net_

Ex. C



On November 21, 2020, I, Greg Gustin, CEO of The Ravenswood Group (TRG), was instructed by Ron Gabaldon, representing Axxcess Capital, to transfer an ICPO security (an obligation to purchase from AIM Brands LLC 15 Million Kimtech Respirators for $2.05/mask, a $30,750,000 obligation) directly to Axxcess Capital.

TRG sold this ICPO to Axxcess Capital for $1 (see exhibit A the ICPO dated 11/22/20 on TRG letterhead on note 4 under the Procedures heading specifically transfers the obligation to Axxcess, buyer code ICPO TRG-AIM-TCDB-AXXCESSv1). See also Exhibit B where Axxcess Capital requests the transfer of the ICPO and accepts the transfer under the same terms, requiring wire transfer prior to pickup.

AIM Brands believed the ICPO paper itself had been purchased, which is why no mutual agreement of cancellation or modification of the ICPO was requested by TRG or AIM. TRG was told by Axxcess multiple times following the 11/21 transfer and inspection by Axxcess that Ron Gabaldon and Axxcess were going to complete the transaction. No request was made to TRG for cancellation or modification of the above stated terms.

Signed this date 26TH day of April 2021

By.

Greg Gustin
CEO/President
The Ravenswood Group

EXHIBIT A



## RAVENSWOOD GROUP

## ICPO

| Date: 11/21/2020 | | Seller Invoice No : TBD | |
|---|---|---|---|
| **Seller Code:** | | **Buyer Code:** | TRG-AIM-YCDB-AXXCESS v1 |
| Company | Aim Brands | Company | The Ravenswood Group (xfer to AXXCESS) |
| Address | 1000 Westpark Drive, Suite 18, Bentonville, AR 72712 | Address | 7950 NW 53rd Street, Suite 337 Miami, Florida 33166 |
| Attention | Marcus Gibbs, VP Sales | Attention | Gregory Gustin, CEO/President |
| Email | Marcusgibbs@aimbrands.net | Email | Greg.Gustin@TheRavenswoodGroup.com |
| Phone | 8 3 3 - 7 2 6 - 7 7 5 9 | Phone | +1.888.265.6962 / +1.863.2453.9599 (c) |
| **Seller Bank Info** | | **Buyer Bank Info** | |
| Name | | Name | Will be provided by AXXCESS Capital |
| Address | | Address | |
| Account Name | | Account Name | |
| Account | | Account | |
| SWIFT | | SWIFT | |

| PROCEDURES | | PRODUCT DESCRIPTION: | | |
|---|---|---|---|---|
| **Delivery:** | FOB Sellers Warehouse | Item | KiniTech by KC 53358 N95 Mask | |
| **Loading Port:** | N/A | SKU | | |
| **Consignee:** | N/A | UPC | | |
| **Destination:** | N/A | NSN | | |
| **Delivery Time:** | Site visit set for 0900 Rogers Arkansas | Quantity | 15 million total units (Masks) | |
| **Payment:** | Wire Transfer against physical onsite approval documents showing Quality and Quantity as approved by AXXCESS | ALL AMOUNT IN US DOLLARS | | |
| **Packing:** | TBP by AIM Brands | UNIT PRICE | QUANTITY | |
| | | $2.05 per mask | 15,000,000 Fifteen Million Masks | |
| **Sold under Incoterms 2020** | | | | |
| **Reference Information:** | | $30,750,000.00 USD | | |
| | | Estimate TOTAL: | | |
| **Bill of Lading #:** to be provided at time of loading | | (ADJUSTED FOR ACTUAL AMOUNT) | | |
| **Container ID #:** to be provided at time of loading | | | | |
| **Note:** 1. TRG will assign(transfer) its rights for the purchase of this allotment to AXXCESS Capital. Per the CC today (11/21) Aim Brands will co-sign this PO, then | | | | |
| 2. TRG will also then transfer its Sell Agreement to AXXCESS over to AIM. | | | | |
| 3. All pricing and fee Agreements will remain as previously agreed. | | | | |
| 4. TRG makes all these transfers for $1. - just to be binding :P | | | | |
| | | | | |
| | | **Buyer: Gregory Gustin** | | |
| | | | | |
| **Seller:** | | | | |

# EXHIBIT B

--------- Forwarded message ---------
From: **Ron Gabaldon** <rgabaldon@axxcesscapital.com>
Date: Sun, Nov 22, 2020 at 12:52 PM
Subject: Axxcess PO
To: Greg Gustin (CEO/President TRG <Greg.Gustin@theravenswoodgroup.com>
Cc: eugene young <info@securearmericasales.com>

Greg,

Per our discussion, you will present our purchase order, direct to the seller. Eugene Young will represent Axxcess Capital on the call, today.

Let me know if you need anything additional, from me.

Regards,

Ron



AXXCESS

Axxcess Capital Partners, LLC
Ron Gabaldon – Managing Director



AXXCESS
C A P I T A L

**Axxcess Capital Partners, LLC**
Ron Gabaldon | Eugene Young
2100 Palomar Airport Rd. Suite 214
Carlsbad, CA 92011

To: The Ravenswood Group    SHIP TO:    P.O. NUMBER 20-00443
Axxcess Capital to Pick Up in AR

Transferred to Greg Ravenswood agreement    P.O. number must appear on
all related correspondence,
shipping papers, and invoices.

| P.O. DATE | REQUISITIONER | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|
| 11/21/2020 | Ron Gabaldon | Eugene Young | | Arkansas | Wire Transfer prior to pick-up |

| QTY | UNIT | DESCRIPTION | | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| 15 Million | | Kimberly Clark Model 53358 N95 | | $2.05 | $30,750,000.00 |

1  Please send two copies of your invoice.
2  Enter this order in accordance with the prices, terms,
   delivery method, and specifications listed above.
3  Please notify us immediately if you are unable to ship as specified.
4  Send all correspondence to:
   Eugene Young
   Email : info@securearmericasales.com
   Phone : 470-376-6500

| | |
|---|---|
| SUBTOTAL | $30,750,000.00 |
| SALES TAX | N/A |
| SHIPPING AND HANDLING | N/A |
| OTHER | |
| TOTAL | $30,750,000.00 |

Ron Gabaldon    11/21/2020

Authorized by: Ron Gabaldon / Eugene Young    11/21/2020

**EXHIBIT D**

**PROOF OF TRANSFER OF TITLE**

**From:   AIM Brands**

**To:      TCR Holdings, LCC**

Per an assignment Agreement, AIM Brands hereby transfers, assigns, and conveys to TCR Holdings the legal title to 11,016,000 Units (respirators) it holds in the warehouse in Rogers, Arkansas.

AIM BRANDS, LLC

_____                    05/19/2021
                                             _____

By:    Christopher Nowlin                            Date
Its:    President

Ex. E

## TCR Holdings LLC

| | |
|---|---|
| Bank Name: | HSBC Bank USA |
| Bank Address: | 452 Fifth Avenue |
| | New York, NY  10018 |
| ABA Number: | 021-001-088 |
| Account Name: | TCR Holdings LLC |
| Account Number: | 134-83296-5 |
| Address: | 135 East 57th Street, 15-103 |
| | New York, NY 10022 |

Ex. F

THIS WARRANT AND THE SECURITIES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT AND APPLICABLE LAWS.

No. 01                                                         Warrant to Purchase
Issue Date: September [___], 2020                         Common Membership Interests
                                                          (subject to adjustment)

## WARRANT TO PURCHASE COMMON MEMBERSHIP INTERESTS
### of
### AIM BRANDS, LLC

       This certifies that, for value received, TCR HOLDINGS, LLC, a Delaware limited liability company, or its assigns (in each case, the "**Holder**") is entitled, subject to the terms set out below, to purchase from AIM BRANDS, LLC, a Delaware limited liability company (the "**Company**"), certain units of Company's common membership interests as set out below or such other substitute security as set out in this Warrant ("**Exercise Units**"), upon surrender of this Warrant, at the principal office of Company, with the executed subscription form attached to this Warrant and simultaneous payment of the Exercise Price as set out in Section 2 below. The term "**Warrant**" will include this Warrant, and any warrants delivered in substitution or exchange as provided in this Warrant.

       This Warrant is executed and delivered in connection with and as a condition to that certain Purchase Agreement for Participating Promissory Notes and Warrants (as the same may from time to time be amended, modified or supplemented, the "**Purchase Agreement**"), and that certain Amended and Restated Participating Promissory Note (the "**Note**"), each of even date with this Warrant (the "**Warrant Issue Date**"), by and between Holder and Company. This Warrant, the exercise of this Warrant, and the Exercise units is subject to the terms and conditions of the Purchase Agreement. Capitalized terms that are used but not specifically defined in this Warrant will have the meanings given to that term in the Purchase Agreement.

       This Warrant amends, restates, and supersedes all prior agreements, documents and similar understandings (written and verbal) about or relating to the issue of securities or ownership in Company to Holder prior to the Warrant Issue Date. For the sake of clarity, Holder and Company desire by this Warrant to combine, amend, and restate all such prior agreements, documents, and similar understandings into this single, restated Warrant.

       The number of Exercise Units will initially reflect as of the Warrant Issue Date the number of Exercise Units equal to Nineteen Percent (19%) of the total outstanding units of Company's Membership Interests, calculated on a fully-diluted, as-if-converted basis, as adjusted in accordance with the provisions below. Holder acknowledges and agrees the Exercise Units issuable to Holder pursuant to this Warrant are subject to dilution, *pro rata* along with the other holders of Company's Membership Interests, in connection with the issuance by Company of equity securities (and securities convertible into equity securities) after the Warrant Issue Date ("**Diluting Events**"). In any such Diluting Event and upon exercise of the Warrants, the effective percentage interest of the Exercise Units will be less than the initial Nineteen Percent (19%) set out above to account for the Diluting Event(s), and such adjusted percentage will reflect the original number of Exercise Units (initially equal to Nineteen Percent (19%) of the total outstanding Company Membership Interests as of the Warrant Issue Date) divided by the total then-current outstanding Company Membership Interests as of the date the calculation is made.

       1.      **Term of Warrant**. Subject to the terms and conditions of this Warrant, the Warrant will be exercisable, in whole or in part, at any time, or from time to time, during the term starting on the Warrant Issue Date and ending five (5) business days after satisfaction of the Note by Company in accordance with the terms and conditions of the Note (the "**Expiration Date**"). The right of a Holder to exercise this Warrant will automatically terminate, without any further action being required of the parties, at 5:00p.m Central Standard Time on the Expiration Date.

2.      **Exercise Price**. The "**Exercise Price**" at which this Warrant may be exercised will be $0.01 per Exercise Unit, as adjusted pursuant to the terms and conditions of this Warrant.

3.      **Exercise of Warrant**.

(a)      The purchase rights represented by this Warrant are exercisable by Holder in whole or in part, at any time, or from time to time, during the term of this Warrant as described in <u>Section 1</u> above, by (i) surrender of this Warrant and the executed and completed Notice of Exercise annexed to this Warrant at the principal office of Company, and (ii) payment in cash, by wire transfer or same day funds or by check acceptable to Company of the purchase price for the Exercise Units to be purchased. In connection with Holder's exercise of this Warrant in connection with any event described in <u>Section 9(b)</u> of this Warrant, Holder may qualify its exercise on consummation of such transaction, and may defer payment of any Exercise Price due thereon until consummation thereof. Under no circumstances will Holder (or its affiliates) be subject to restrictions on its ability to conduct business or make any investment it deems appropriate (other than restrictions on transfer under applicable state and federal securities laws).

(b)      This Warrant will be deemed to have been exercised immediately prior to the close of business on the date of its surrender for exercise as provided above, and the person entitled to receive the Exercise Units issuable upon such exercise will be treated for all purposes as the holder of record of the units as of the close of business on that date. In the event this Warrant is exercised in part, Company at its expense will execute and deliver to Holder a new Warrant in substantially similar form as this Warrant exercisable for the number of remaining units for which this Warrant may then be exercised.

(c)      Exercise of this Warrant will automatically and immediately, without any further action being required of the parties, cancel and terminate Holder's right, if any, to receive the Purchaser Note Participation Interest (as defined in the Purchase Agreement).

4.      <u>No Fractional Units</u>. No fractional units will be issued upon the exercise of this Warrant. In lieu of any fractional unit to which Holder would otherwise be entitled, Company will make a cash payment equal to the Exercise Price multiplied by such fraction.

5.      <u>Replacement of Warrant</u>. On receipt of evidence reasonably satisfactory to Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of loss, theft or destruction, on execution and delivery of an indemnity agreement reasonably satisfactory in form and substance to Company or, in the case of mutilation, on surrender and cancellation of this Warrant, Company at its expense will execute and deliver, in lieu of this Warrant, a new warrant in substantially similar form and amount as this Warrant.

6.      <u>Rights of Members</u>. Except as expressly set out in this Warrant or the Related Documents (as defined in the Purchase Agreement), Holder will not be entitled to vote or receive distributions or be deemed the holder of Exercise Units or any other securities of Company that may at any time be issuable on the exercise of this Warrant for any purpose, nor will anything contained in this Warrant be construed to confer upon Holder with respect to the Exercise Units underlying this Warrant, any of the rights of a member of Company or any right to vote for the election of managers or upon any matter submitted to members at any meeting thereof, or to give or withhold consent to any limited liability company action, until the Warrant has been exercised as provided in this Warrant.

7.      <u>Transfer of Warrant</u>.

(a)      <u>Warrant Register</u>. Company will maintain a register (the "**Warrant Register**") containing the names and addresses of Holder and all other holders of warrants of Company. Any Holder of this Warrant or any portion thereof may change its address as shown on the Warrant Register by written notice to Company requesting such change. Any notice or written communication required or permitted to be given to Holder may be delivered or given by mail to Holder as shown on the Warrant Register and at the address shown on the Warrant Register. Until this Warrant is transferred on the Warrant Register of Company, Company may treat Holder as shown on the Warrant Register as the absolute owner of this Warrant for all purposes, notwithstanding any notice to the contrary.

2

(b)     [reserved]

(c)     Transferability and Nonnegotiability of Warrant. This Warrant may not be transferred or assigned in whole or in part without (i) compliance with all applicable federal and state securities laws by the transferor and the transferee (including the delivery of investment representation letters reasonably satisfactory to Company) and (ii) prior consent of Company's Board of Managers, for which consent will not be unreasonably withheld. Subject to the foregoing, transfers must be completed by Holder executing the Assignment Form annexed to this Warrant.

(d)     Exchange of Warrant Upon a Transfer. On surrender of this Warrant for exchange upon a transfer, properly endorsed on the Assignment Form and subject to the provisions of this Warrant with respect to compliance with the Securities Act of 1933, as amended (the "**Act**"), and with the limitations on assignments and transfers contained in this Warrant, Company at its expense will issue to or on the order of Holder a new warrant(s) in substantially similar form, in the name of Holder or as Holder (on payment by Holder of any applicable transfer taxes) may direct, for the number of units issuable upon exercise thereof.

(e)     Compliance with Securities Laws.

(i)     Holder, by acceptance of this Warrant, acknowledges and agrees that this Warrant and the Exercise Units to be issued upon exercise of the Warrant or conversion thereof are being acquired solely for Holder's own account and not as a nominee for any other party, and for investment and not with a view towards distribution or resale thereof, and that Holder will not offer, sell or otherwise dispose of this Warrant or any Exercise Units to be issued upon exercise of this Warrant or conversion thereof except under circumstances that will not result in a violation of the Act or any state securities laws. Upon exercise of this Warrant, Holder will confirm in writing, in a form satisfactory to Company, that the purchased Exercise Units are being acquired solely for Holder's own account and not as a nominee for any other party, for investment and not with a view towards distribution or resale in violation of the Act.

(ii)     Holder, by acceptance of this Warrant, represents that Holder is an "accredited investor" within the meaning of Securities and Exchange Commission Rule 501 of Regulation D promulgated under the Act, as presently in effect.

(iii)     Any new issuance of a Warrant and all Exercise Units issued upon exercise of this Warrant or conversion thereof will include a legend in substantially the following form (in addition to any legend required by state securities laws or any other agreement between Holder and Company):

THIS WARRANT AND THE SECURITIES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT AND APPLICABLE LAWS.

8.     Reservation of Membership Interests. Company covenants that during the term this Warrant is exercisable, Company will reserve from its authorized and unissued Membership Interests a sufficient number of units to provide for the issuance of Exercise Units upon the exercise of this Warrant and, from time to time, will take all steps necessary to amend its Certificate of Formation (as amended or restated from time to time, the "**Certificate**") and Operating Agreement, as amended, to provide sufficient reserves of Exercise Units issuable upon exercise of the Warrant. The Company further covenants that all units that may be issued upon the exercise of rights represented by this Warrant and payment of the Exercise Price, all as set out in this Warrant, will be free from all taxes, liens and charges in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously or otherwise specified in this Warrant and in such case Company will not be required to issue such units until the tax has been paid or it has been established to Company's reasonable satisfaction that no tax or other charge is due).

3

9.    Notices.

(a)    Whenever the Exercise Price or the number of Exercise Units purchasable under this Warrant requires adjustment pursuant to the terms and conditions of this Warrant, Company at its expense provide Holder with written notice setting out, in reasonable detail, the event requiring the adjustment or readjustment, the amount of the adjustment or readjustment and the Exercise Price and number of units purchasable under this Warrant after giving effect to such adjustment or readjustment. Holder, subject to the ability to revoke consent, consents to all notices by electronic communication under applicable Delaware law. Company will, upon the written request of Holder at any time, provide certification of: (i) all adjustments and readjustments that have been effected under this Warrant; (ii) the Exercise Price at the time in effect and (iii) the number of Exercise Units, the type of Exercise Units and the amount, if any, of other property that at the time would be received upon the exercise of the Warrant. At Holder's reasonable request, Company will reissue this Warrant to account for all such adjustments.

(b)    If (i) any change of control, any capital reorganization of Company, any consolidation or merger of Company with or into another entity, or any conveyance of all or substantially all of the assets of Company to another entity, or (ii) of any voluntary dissolution, liquidation or winding-up of Company, then, and in each such case, Company will provide notice to Holder specifying, as the case may be, the date on which such change of control, sale, reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up is to take place, and the time, if any is to be fixed, as of which the holders of record of Exercise Units (or such other securities at the time receivable upon the exercise of this Warrant) will be entitled to exchange their Exercise Units (or such other securities at the time receivable upon the exercise of this Warrant) for securities or other property deliverable upon such change of control, sale, reorganization, reclassification, consolidation, merger, conveyance, dissolution, liquidation or winding-up.

(c)    All such notices, advices and communications will be deemed to have been received (i) in the case of personal delivery, on the date of such delivery, (ii) in the case of mailing, on the next business day following the date of such mailing by overnight delivery or (iii) if sent by electronic mail, on the next business day following the date of such electronic communication when directed to the relevant electronic mail address.

10.    Amendments. Any term of this Warrant may be amended only with the written consent of Company and Holder. No waivers of, or exceptions to, any term, condition or provision of this Warrant, in any one or more instances, will be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision.

11.    Adjustments. The Exercise Price, the type of Exercise Units and the number of units purchasable under this Warrant are subject to adjustment and substitution from time to time as follows:

11.1    Reclassification, etc. If Company, at any time while this Warrant or any portion of this Warrant remains outstanding and unexpired, by reclassification of securities or otherwise change any of the securities as to which purchase rights under this Warrant exist into the same or a different number of securities of any other class or classes, this Warrant will thereafter represent the right to acquire such number and kind of securities as would have been issuable as the result of such change with respect to the securities that were subject to the purchase rights under this Warrant immediately prior to such reclassification or other change and the Exercise Price therefor will be appropriately adjusted, all subject to further adjustment as provided in this Section 11.

11.2    Split, Subdivision or Combination of Units. If Company at any time while this Warrant or any portion of this Warrant remains outstanding and unexpired, splits, subdivides or combines the securities as to which purchase rights under this Warrant exist into a different number of securities of the same class, the Exercise Price for such securities will be proportionately decreased in the case of a split or subdivision or proportionately increased in the case of a combination.

11.3    Liquidation. If Company, at any time prior to the expiration of this Warrant and prior to the exercise of this Warrant, dissolves, liquidates or winds up its affairs, Holder will be entitled, upon the exercise of this Warrant in accordance with its terms, to receive, in lieu of the Exercise Units which it would have been entitled to receive, the same kind and amount of assets as would have been issued, distributed or paid to it upon exercise of the Warrant, had Holder been the holder of record of the number of Exercise Units receivable upon the exercise of

4

this Warrant on the record date for the determination of those entitled to receive any such liquidating distribution, less the applicable purchase price payable upon exercise of this Warrant.

12.     <u>Descriptive Headings and Governing Law</u>. Headings for sections and paragraphs in this Warrant are for convenience only and do not constitute a part of the Warrant. This Warrant will be construed and enforced in accordance with, and the rights of the parties will be governed by, the laws of the State of Delaware without regard to conflicts of law provisions.

13.     <u>Successors and Assigns</u>. This Warrant will bind and inure to the benefit of and be enforceable by the parties to this Warrant and their respective permitted successors and assigns.

14.     <u>Warrant Treatment</u>. Company and Holder will not treat the Warrant or the Exercise Units as being granted or issued as property transferred in connection with the performance of services or otherwise as compensation for services rendered.

[SIGNATURE PAGE FOLLOWS]

5

Exhibit E, page 039

IN WITNESS OF AGREEMENT, the undersigned parties execute this WARRANT TO PURCHASE COMMON MEMBERSHIP INTERESTS, dated and effective as of the Warrant Issue Date set out above.

TCR HOLDINGS, LLC

By: _____

Name: J William Uhrig

Title: Managing Member

Address: C/o Three Cube Research, Inc.

135 E 57th St, 15-103 New York, N.Y. 10022

Email: chris@tcr-ny.com

AIM BRANDS, LLC

By: _____

Name: Christopher Nawlin

Title: Managing Director

Address: 1002 SW Westpark Dr.

Bentonville, AR 72712

Email: kitnawlin@ebmbrands.net

[SIGNATURE PAGE TO AIM BRANDS, LLC
WARRANT TO PURCHASE COMMON MEMBERSHIP INTERESTS]

**NOTICE OF EXERCISE**

To:     AIM BRANDS, LLC

Name: _____          Current Date: _____

Warrant Issue Date:_____

Exercise Units: _____

      (1)     The undersigned hereby elects to purchase _____ Exercise Units of AIM BRANDS, LLC, pursuant to the provisions of the attached Warrant, and tenders payment of the purchase price for such units in full.

      (2)     Representations. In exercising this Warrant, the undersigned hereby confirms and acknowledges that:

      (a)     The undersigned is sufficiently aware of Company's business affairs and financial condition, and has acquired sufficient information about Company, to have reached an informed and knowledgeable decision to exercise the Warrant and purchase the Exercise Units (the "**Units**").

      (b)     The undersigned understands and acknowledges that the exercise of its right to purchase the Units is expressly conditioned upon compliance by the undersigned with the all federal securities laws and all state securities laws applicable to it.

      (c)     The Units are being acquired solely for the account of the undersigned and not as a nominee for any other party, and for investment and not with a view to, or for sale in connection with, a distribution of any of the Units, and that the undersigned will not offer, sell or otherwise dispose of any such Units except under circumstances that will not result in a violation of the Securities Act of 1933, as amended (the "**Securities Act**"), or any applicable state securities laws.

      (d)     The exercise of the Warrant is subject to all of the terms and conditions of the Warrant.

      (e)     Please issue the Units in the name of the undersigned or in such other name as is specified below:

                     _____
                                (Name)

      (3)     Please issue a new Warrant for the unexercised portion of the attached Warrant in the name of the undersigned or in such other name as is specified below:

                     _____
                                (Name)

                               _____
                               Name: _____
                               Date: _____

## ASSIGNMENT FORM

FOR VALUE RECEIVED, the undersigned registered owner of this Warrant hereby sells, assigns and transfers unto the Assignee named below all of the rights of the undersigned under the within Warrant, with respect to the number of Exercise Units (or Common Membership Interests issuable upon conversion thereof) set out below:

**Name of Assignee**          **Address**          **No. of Units**

and does hereby irrevocably constitute and appoint the Chief Executive Officer (or his/her designee) of AIM Brands, LLC (the "**Company**"), to make such transfer on the books of Company, maintained for the purpose, with full power of substitution in the premises.

The undersigned also represents that, by assignment of this Warrant, Assignee acknowledges that this Warrant and the units of membership interest to be issued upon exercise of this Warrant or conversion thereof are being acquired for investment and not with a view towards distribution or resale thereof and that Assignee will not offer, sell or otherwise dispose of this Warrant or any units of membership interest to be issued upon exercise of this Warrant or conversion thereof, except under circumstances which will not result in a violation of the Securities Act of 1933, as amended, or any state securities laws. Further, Assignee has acknowledged that upon exercise of this Warrant, Assignee will, if requested by Company, confirm in writing, in a form satisfactory to Company, that the units of membership interests so purchased are being acquired for investment and not with a view toward distribution or resale. The undersigned further represents that, by assignment of this Warrant, Assignee is an "accredited investor" within the meaning of Securities and Exchange Commission Rule 501 of Regulation D promulgated under the Securities Act.

Name:_____

Dated:_____